UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| VICKI R. ROSS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:12-CV-334 CDP |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM AND ORDER**

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Vicki Ross's application for disability

insurance benefits under Title XVI of the Social Security Act.  42 U.S.C. §§ 1381

*et seq.*  Ross claims she is disabled because she suffers from a combination of

impairments, including degenerative disc disease, a seizure disorder, depression,

anxiety, and asthma resulting in chronic bronchitis.  After two hearings, the

Administrative Law Judge concluded that Ross was not disabled.  Because I

conclude that the decision denying benefits was supported by substantial evidence,

I will affirm.

## **Procedural History**

Ross filed her application for disability insurance benefits on August 15,

2007, alleging a disability onset date of December 1, 2006.  When her application

was denied, she requested a hearing before an administrative law judge.  She then

appeared and testified, without counsel, at a hearing that took place October 1,

2008.  After the hearing, the ALJ denied her application, and Ross appealed to the

Appeals Council.  Finding that the ALJ had not specified whether Ross's

impairments were "severe" and that he needed to obtain additional evidence, the

Council remanded the case to the ALJ for further proceedings.  The ALJ held a

second hearing, at which both Ross (again without counsel) and a vocational expert

testified.  The judge then denied her application for a second time.  Ross appealed

to the Appeals Council again, but it denied her request for review.  The ALJ's

decision thereby became the final decision of the Commissioner.  *Van Vickle v.*

*Astrue*, 539 F.3d 825, 828 (8th Cir. 2008).

Ross now appeals to this court.  She argues that (1) the ALJ's assessment of

her maximum residual function capacity was improper because it did not include

limitations related to her seizures, back pain, and mental conditions; and as a

corollary, the ALJ improperly analyzed the treatment records related to those

conditions; (2) the ALJ failed to develop a full and fair record because he did not

order any consultative examinations; and (3) the ALJ improperly assessed her

credibility without addressing the credibility factors set out in Eighth Circuit case law.

## II.  **Evidence Before the Administrative Law Judge**

Ross has appealed the ALJ's second decision, made after remand by the Appeals Council.  For that reason, all of the medical records submitted to the ALJ at any time constitute part of the record and will be reviewed.  Ross alleges an onset date of disability of December 1, 2006, but some discussion of medical records prior to this date will be included to provide needed background information.

### *Medical Records*

According to medical records before the ALJ, Ross was in a car accident in November 2004.  In January 2005, a lumbar spine MRI showed mild degenerative disc disease, as well as facet joint osteoarthritis with minimal disc bulging at L4-L5.  She visited St. John's Mercy Hospital multiple times in 2005 to seek treatment for sciatica, lumbago and recurrent neck, back, and hip pain.  She was prescribed and attended numerous sessions of therapeutic exercise throughout the year.  In early 2005, Ross completed a series of three epidural steroid injections to her back, which she reported failed to relieve her pain.  An MRI of Ross's lumbar spine, taken on August 11, 2005, showed "no significant change" from the January MRI.

In September 2005, Ross went to the emergency room for back pain, which she reported had increased over the previous several days, particularly in her right sacroiliac joint and her right buttock.  Though she denied weakness or numbness in her legs, she stated that "sometimes it causes her right leg to give out when she gets the pain."  She also reported pain in her right hip and told the ER physician that she had been told she had severe arthritis in her right hip.  A physical exam revealed tenderness in Ross's lumbar paraspinous muscles on the right side, and also in her right sacroiliac joint and along the right sciatic nerve in her right buttock.  The ER doctor noted that she was "able to walk after she had some analgesic with good weightbearing."   He diagnosed her with acute exacerbation of lumbosacral pain, and prescribed morphine, Kytril and Toradol, given intravenously, as well as other painkillers, including Percocet and Flexeril.  The IV resolved Ross's pain "down to a 1-2."  Ross was referred to another doctor for physical therapy.

The following year, Ross visited her primary care physician, Dr. Keith Morris, in April and June 2006.  Dr. Morris gave Ross several notes excusing her from work on certain days.  Dr. Morris' treatment notes indicate that Ross's back pain "ha[d] worsened."

On June 13, 2006, Ross received a Toradol injection to her left buttock.  Less than a week later, on June 19, 2006, Ross called Dr. Morris because of

continuing back pain, and he referred her to the emergency room.  The ER

physician, Dr. Steven Judge, noted that she "look[ed] to be in some moderate

distress."  According to his treatment notes, Ross "says she has refused in the past

week narcotics, but says that now she is willing to take them if necessary."  Noting

her history of back pain, Dr. Judge wrote, "she thinks something has changed as do

I."  He prescribed three analgesics, an antihistamine, and Valium, scheduled Ross

for an MRI the following day, and noted that she was stable upon discharge.  The

MRI showed "no definite interval change" between her discs.  Ross also received

more injections of Toradol, as well as Norflex, that same week.

On October 19, 2006, Ross went to the emergency room again, complaining

that she was experiencing shortness of breath, sharp chest pains, and numbness in

her face and hands.  A CT scan revealed that Ross had a pulmonary embolism, and

she was admitted to the hospital for three days and treated there.  She was

discharged in "relatively stable condition" and prescribed Cymbalta, Prevacid,

Naproxen, Flexeril, Xanax, Coumadin, and Lovenox.  In addition to the embolism,

she was diagnosed upon discharge with chronic bronchitis, tobacco abuse, chronic

low back pain, depression, and gastroesophageal reflux disease.  Ross saw Dr.

Morris later that week, reporting symptoms related to her embolism, including

bloating, shortness of breath, fluid retention, chest pain, achiness, and fatigue.

On November 2, 2006, Ross saw Dr. Morris again.  During a physical exam, he noted that she had a full range of motion in her spine and extremities, which showed normal stability, strength, and tone.  His treatment notes indicate that her anxiety and depression were stable, but that her headaches had worsened.  He prescribed Fioricet to alleviate those symptoms.  Dr. Morris instructed Ross to return in a week and gave her a note excusing her from work from October 19 through November 5, 2006.

On November 5, 2006, Ross was taken to the emergency room in an ambulance, complaining of sharp pleuritic chest pain, which she rated as a 5/10.  She reported not being able to feel her feet.  A CT scan of her lungs was mostly normal, but showed a "small patchy infiltrate" in her right lung.  An MRI of the brain and CT scan of her head were normal.  After testing, she was discharged and advised not to drive for six hours and to follow up with Dr. Morris in a few days.

Later that week, on November 10, 2006, Ross was transported to the hospital again for symptoms of chest pain and shortness of breath.  The EMS reported Ross was very anxious and was hyperventilating and having spasms.  They "had trouble getting a pulse oximetry on her."  She was tested again and sent home.  A CT angiography of her chest revealed nothing abnormal.

Ross visited Dr. Morris on November 13, 2006.  According to his treatment notes, she was not in distress.  He noted that her depression, asthma, low back

pain, headaches, and pulmonary embolism were all stable.  He gave Ross a note excusing her from work from November 13 to 15, 2006.  He advised in the note that she should not lift more than ten pounds, and wrote that Ross "may work as tolerated per further notice."

Also in November 2006, Ross was evaluated by Holter monitor.[1]  At the time, she had a headache and chest pain.  The monitor revealed borderline sinus tachycardia[2] (between 95 and 103 beats per minute), but no arrhythmia or ST wave changes.  An MRI of her brain completed that month was unremarkable.

On December 8, 2006, Ross was found lying in a parking lot at work with an active generalized seizure.  Ross reported that she had walked outside and felt dizzy and lightheaded before the seizure.  She also stated she had recently felt clumsy in her arms and had been jerking her arms while in bed at night.  EMS noted that she had bitten her lip during the seizure.  She was admitted to the hospital overnight, and an EEG of her brain activity was abnormal and "strongly suggestive" of a seizure tendency.  Dr. Jamie Haas, a neurologist, diagnosed Ross with generalized seizure disorder and determined that she would "need to be on medication life long."  Because Ross expressed more interest in cheaper

---

[1]  A Holter monitor is "a technique for long-term, continuous usually ambulatory, recording of electrocardiographic signals on magnetic tape for scanning and selection of significant but fleeting changes that might otherwise escape notice."  STEDMAN'S MED. DICTIONARY (27th ed. 2000).
[2]  Tachycardia is "rapid beating of the heart," usually over 90 beats per minute.  STEDMAN'S.

– 7 –

medications that required only a once-a-day dose, Dr. Haas started her on

Zonegran.

By December 13, 2006, the embolism Ross had developed in October 2006

had almost completely resolved, but she reported that her chest pain continued.

She had no exertional symptoms at that time.  Dr. Morris referred her to

cardiologist Dr. John Mohart.  Dr. Mohart suggested a cardiac catheterization to

further evaluate Ross's chest pain symptoms.  At that time, Ross had some sinus

tachycardia, and Dr. Mohart prescribed low-dose Toprol and advised Ross to have

an echocardiogram.  She reported smoking a half-pack of cigarettes per day by that

time, which was an improvement for her.

The echocardiogram and cardiac catheterization were both completed in

January 2007.  They showed mostly normal heart function, with mild tricuspid

regurgitation.  In the same week, a prothrombin time test[3] was abnormally high.

Dr. Mohart recommended "continuing aggressive medical therapy aimed at risk

factor modification," and stated that other etiologies of Ross's chest pain were also

being evaluated.

On January 3, 2007, Ross saw Dr. Haas for seizures again.  She reported at

least two generalized seizures in December, including a seizure on Christmas Eve

2006, where she ended up on the kitchen floor.  Dr. Haas noted that the Zonegran

---

[3]  This test measures the rate at which plasma clots.  A high reading indicates that it took longer to clot.  STEDMAN'S.
Throughout 2007, Ross was taking Coumadin, a blood thinner, to resolve her pulmonary embolism.  Prothrombin
time tests were administered to her frequently that year, and always showed abnormally high results.

he had prescribed was not providing relief and was actually making Ross's seizures worse.  He reduced her dosage with the plan to switch her to Topamax afterward.  At the time, Ross was still taking Coumadin for the pulmonary embolism.  Dr. Haas wrote in her treatment notes that Ross had a history of a bulging disk and abdominal pain, as well as the embolism, migraines, chest pain, tachycardia, and seizures.  A physical exam revealed that her gait and motor skills were normal, and she had 5/5 strength.

Dr. Mohart's notes indicate that Ross called on January 19, 2007 and reported that her right leg was swollen from knee to thigh and felt hot, likely due to her embolism.  She was instructed to see Dr. Morris, or go to the emergency room.  An MRI of Ross's brain, prescribed by Dr. Haas later that month, was normal.  On January 30, 2007, Dr. Morris wrote a note excusing Ross from work from January 29 to February 5, 2007.

On February 5, Ross visited Dr. Haas.  He noted he had switched Ross's prescription to 50 milligrams of Topamax, but Ross continued to have seizures.  He increased the dosage to 100 milligrams.  He noted that Ross "wanted a release from work for the next couple of weeks and I gave this to her today until at least 2/19/07."  Two more notes from Dr. Morris extended this release from work until March 14, 2007.

– 9 –

Later that month, on March 26, 2007, Ross returned to the emergency room and saw Dr. Judge, who noted that Ross was "not working because of her illness." Ross reported that she had been unable to eat for about a week, and had tingling in her hands and feet, sharp non-radiating joint pain rated as 8/10, headaches, and decreased urinary output.  Dr. Judge conducted a physical evaluation, which revealed mostly normal findings.  However, he wrote that the turgor and texture of Ross's skin "seemed a little down."  He also wrote that Ross "seems extremely depressed and seems like that is possibly playing a role in her illness.  Very, very depressed."  She was slightly dehydrated, and Dr. Judge found some evidence of prenatal azotemia.[4]  Writing that Ross had "multiple medical problems," Dr. Judge admitted her to the hospital, and recommended she be seen by Drs. Morris and Haas, as well as another doctor.  He evaluated her condition as "guarded" at the time.  He noted that Ross attributed all her symptoms to the Topamax, which she was still taking to control her seizures.  That same day, another treating physician, Dr. Leslie Tucker, stated that Ross was "depressed-appearing, flat-affected."  Dr. Tucker also noted that, "The patient has not worked since November. She is depressed. She can't drive."

According to medical records, Ross remained in the hospital for five days, until March 31, 2007.  She was released by Dr. Morris and prescribed Percocet,

---

[4] Prenatal azotemia is defined as "nitrogen retention resulting from something other than primary renal disease." STEDMAN'S.

Keppra to control her seizures, Effexor for depression, and Coumadin to prevent another pulmonary embolism.  Topamax was discontinued.  Upon discharge, Dr. Morris diagnosed Ross with anorexia, convulsions, iron deficiency anemia, obstructive chronic bronchitis, hyperpotassium, dehydration, abdominal pain, headache, and depressive disorder.  Other treating doctors also noted her seizures, over-anticoagulation, the recent pulmonary embolism, cholecystitis,[5] tachycardia, and excessive menstruation.  During her hospitalization, Ross reported that she had been a longtime smoker but had currently stopped smoking.

In May 2007, Ross returned to the emergency room with complaints of abdominal pain, nausea and vomiting.  A cytopathology test showed mild chronic inflammation in some sections of Ross's gallbladder.  She was diagnosed with cholelithiasis[6] and underwent a laparoscopic cholecystectomy (removal of the gallbladder) and an endometrial ablation.  Afterward, she was discharged and prescribed a short course of Lovenox (an anticoagulant), as well as painkillers and other medications.  She was advised to restart Coumadin, which she had stopped taking in preparation for surgery.

Ross saw Dr. Morris for medication management at the end of May 2007.  His treatment notes indicate that her conditions, which he identified as depression, low back pain, and seizures, were all stable.  He instructed her to return in a month.

---

[5]   Inflammation of the gallbladder.  *Id.*
[6]   Cholelithiasis is the "presence of concretions in the gallbladder."  *Id.*

A blood test in June was normal, but a blood test in July 2007 revealed a high platelet count and an abnormal red cell distribution width.

On August 21, 2007, Ross saw Dr. Morris again.  According to his treatment notes, Ross reported a recent flare of back pain and noted limitation of motion, pain radiation, and stiffness.  She reported her most recent seizure had been at the end of July.  At the time, she also had acute bronchitis and was taking Effexor for depression, Coumadin for the pulmonary embolism, Cipro for her respiratory infection, and Keppra to control her seizures.  Dr. Morris ordered a blood test to check for hypothyroidism.

At visits to Dr. Morris on November 29, 2007 and January 30, 2008, Ross reported increased back pain.  She also reported being unable to lift her left arm, for which Dr. Morris prescribed Naprosyn.  Until April 24, 2008, Ross visited Dr. Morris' office monthly for weight and blood pressure checks.  She was tapered off Coumadin in January 2008.  She reported stopping smoking in April 2008.

On May 21, 2008, Ross visited Dr. Morris, complaining of a productive cough, sore throat, headache, and shortness of breath.  During a physical exam, Dr. Morris noted that Ross displayed decreased air entry into both lungs.  He also noted that she had a "depressed mood."  He diagnosed her with bronchitis and prescribed increased fluids and antibiotics.

Ross went to the ER on June 12, 2008, complaining of pain and swelling in her right leg, which had started 10 hours prior and was "gradually worsening." Ross reported that the pain was exacerbated by walking and relieved by rest. Treatment notes from the ER doctor state, "discussed with pt that if she wants CT we can get one but no sx, no need!"  She was tested for deep venous thrombosis, but the test results were negative.  A few days later, she followed up with Dr. Morris, who diagnosed her with superficial thrombophlebitis[7] and prescribed Levaquin (an antibiotic) and Naprosyn.  He noted her convulsions were stable on Keppra, that her headaches were stable, and that she was taking the appetite suppressant Phentermine to control weight gain.

Dr. Morris referred Ross to Dr. Jamie Borgmann for her leg pain.  At a visit on July 15, 2008, Dr. Borgmann noted Ross was still having pain in her right calf, which was "swollen and tender when I touched it," but was not red or warm.  Ross reported that it was painful to walk and to sleep at night, and that she also had back problems.  She was tested for an embolism and for deep venous thrombosis, but the results were negative.  An MRI of her right calf on July 23, 2008, was mostly normal except for "minimal edema type change anterior to the tibia."

At a routine visit on December 4, 2008, Dr. Morris noted that Ross had sacroiliitis, abnormal weight gain, convulsions, lumbago, and depressive disorder.

---

[7] Inflammation of the veins.  *Id.*

He also noted that she had normal energy and activity levels.  According to his treatment notes, Ross reported having two seizures two weeks prior to the office visit.  She stated that the seizures were three days apart.  Dr. Morris prescribed the oxycodone-acetaminophen to treat pain, Soma to treat spasms, Effexor to treat depression, Phentermine to control Ross's weight gain, and Keppra to control her seizures.  He instructed Ross to return in three months.

Ross returned to Dr. Morris' office on February 4, 2009.  She reported a seizure the previous night.  She stated that she had gotten up after hearing a noise and had woken up on the floor.  She complained of a dull headache, buzzing ears, soreness all over, and extreme fatigue.  At a follow-up visit on April 6, 2009, Dr. Morris noted that Klonopin was helping Ross sleep but "her back does keep her awake at times."  He also noted that Ross reported a seizure from mid-March.  He wrote, "Patient is under considerable stress through her marriage and loss of her job due to her seizure activity. Seizures have been fairly well controlled [and she] is able to note that seizures occur with sleep deprivation."  At the time, Ross was taking AlleRx-D, Soma, oxycodone, Effexor, Keppra and aspirin.   At an office visit in June, Ross reported having one seizure in early May.

On July 29, 2009, Ross was taken by ambulance to the emergency room, complaining of chest pains associated with a panic attack.  Testing showed no abnormalities.  She was discharged with a referral for an echocardiogram stress test

and a carotid Doppler test and prescribed exercise, an inhaler, aspirin, Keppra, Klonopin for headaches, and Soma for back spasms.

Several months later, on December 7, 2009, Ross saw Dr. Morris for a medication review.  She reported three seizures over the last three or four months.  She stated that the seizures lasted two or three minutes and that they were "mild" and did not require visiting the ER or hospitalization.  She also reported worsening back pain.

The following spring, on March 16, 2010, Ross returned to Dr. Morris' office, complaining of severe back pain, which radiated into her right hip and leg, as well as numbness in her toes.  She reported that these symptoms had worsened after she fell during a seizure three weeks prior.  During a physical exam, Dr. Morris noted a "markedly increased amount of spasm" in Ross's back, in addition to a limited range of motion and tenderness especially on her right side.  He noted that Ross was in "moderate distress" and was "ill appearing," and remarked that "she lives in a stressful situation."  He also found both of her sacroiliac joints were abnormal and that she had osteoarthritic changes in both hands.  Dr. Morris prescribed a muscle relaxants and two NSAIDs for sacroiliitis, and continued Ross's prescriptions of Keppra, Phentermine, Percocet, Effexor, and albuterol.

Two months later, on May 25, 2010, Ross had a scheduled office visit with Dr. Morris, complaining that her back pain had not gotten any better and that

spasms in her lower back had gotten worse since she started taking the muscle relaxant.  She also reported continuing numbness in her toes.  According to Dr. Morris' treatment notes, Ross's anxiety was stable "for the most part," but she was still experiencing a "very difficult home situation," racing thoughts, difficulty concentrating, general malaise, joint pain, lumbago with sciatica, and a low activity and energy level.  Dr. Morris noted that he and Ross had a "[l]ong discussion regarding the need for good sleep hygiene with her seizure disorder."  He prescribed many of the same medications Ross had been taking, as well as Arthrotec.

In mid-2010, Dr. Gretchen Kluesner took over Dr. Morris' practice.  Dr. Kluesner met with Ross for the first time on August 30, 2010 and described Ross's history of seizures and back pain.  She noted that Ross did "not want to see neurologist."  A physical examination revealed posterior tenderness of Ross's back.  Dr. Kluesner wrote that:

> pt does not want prescription pain meds as states husband is addicted to them and does not want them in the house. states using soma as needed along with klonopin before bed with improvement in symptoms. is trying for disability.

On December 14, 2010, Ross had an office visit with Dr. Kluesner.  Ross had analgesic and anti-inflammatory injection to her right buttock.  Dr. Kluesner noted that she gave Ross only five Vicodin pills because Ross "refuses any narcotics" out of fear that her "husband will take her meds."  According to Dr. Kluesner's notes,

Ross reported a dramatic increase in back pain, constant stiffness, and new pains in both shoulders, hands, elbows, and knees.  Dr. Kluesner wrote that Ross was now unable to take NSAIDs because of stomach intolerance.  She observed that Ross was in "no acute distress," but that her spine was "positive for posterior tenderness," paravertebral muscle spasm, and bilateral lumbosacral tenderness.

On that same date, Ross was also tested for Sjogren's syndrome,[8] and Dr. Kluesner received the results later than week.  The test revealed positive results for a type of Sjogren's antibodies, as well as a high erythrocyte sedimentation rate.  At a follow-up office visit on January 18, 2011, Dr. Kluesner diagnosed Ross with an unspecified connective tissue disease that was "likely" Sjogren's syndrome.  She planned to redo the lab tests, and if they still yielded positive results, would start Ross on new medication.

At the time, Ross also had acute bronchitis and was prescribed Cipro.  She complained of joint pain, back pain, and a prolonged history of dry eyes and mouth.  Ross reported that she had been unable to tolerate contacts.  According to Dr. Kluesner's notes, Ross reported "no relief with pain meds" and that she was "unable to function."  At the time, she was taking aspirin, Keppra, Klonopin, Phentermine, albuterol, and Soma.  Dr. Kluesner ordered several lab tests.

---

[8]  Sjogren's syndrome is an autoimmune disease that causes "dryness of the mucous membranes," bleeding under the skin, and enlarged salivary glands.  It is often seen in menopausal women and associated with rheumatoid arthritis, among other conditions.  STEDMAN'S.

### *October 1, 2008 Hearing Testimony*

At the first hearing before the ALJ, Ross appeared without counsel.  She testified that she had an associate's degree in nursing.  She had started working as a charge nurse at Sunset Health Care Center in 2000 and by the time she left that employer in December 2006, she was director of nursing.  As director, she oversaw the nursing department, conducted training and in-service programs, and provided patient care on a daily basis.  When caring for patients, she administered medications, transported patients, and sometimes bathed patients.

After her employment with Sunset Health ended, Ross worked from home for a government research company for a short time in 2007–08.  For that company, Ross made phone calls to complete surveys and get information.  She stated that was her only work since leaving the nursing home.  She testified that she also received unemployment benefits briefly in 2007:

> ALJ: And why was it for so short a time?
> Ross: Because . . . I'm assuming the judge that heard the case felt that it was more disability . . . that he didn't feel that I would be able to work.
> ALJ: Was there also an issue as to whether or not you had been terminated from the prior place or had quit?
> Ross: My understanding was that I was terminated.  But according to the hearing, that was not true, and they had offered me a – said they had a position as far as teaching [Certified Nursing Assistants], but there was no position.
> ALJ: So in other words, your former employer contested your receiving the employment benefits.
> Ross: Correct.
> ALJ:  And then once a decision came down, it was adverse to you?

Ross: Yeah.

(Tr., pp. 59–60.)

Ross testified that she left her job as nursing director because of her health. When the ALJ asked her to explain in more detail, Ross mentioned the back injury she sustained in the 2004 car accident. She testified that as a result of the accident, she could no longer lift more than 15 pounds at a time. She stated that she had gotten MRIs of her back, which revealed minimal degenerative disc disease, most recently in June 2006. Ross also stated that in October 2006, she had been hospitalized because of a pulmonary embolism, but it had resolved and had not reoccurred, as far as she knew. She stated that she was taking aspirin as a blood-thinner and had been prescribed Coumadin until January 2008 as a precaution.

Ross also testified that she had begun having seizures in November 2006. Sometimes she got a severe headache and clogged ears before a seizure began but sometimes there were no warning signs at all. She testified that she had been bruised during seizures, and she had hit her head or neck, causing stiffness. The seizures were ongoing, and she stated she had experienced at least three in 2008, most recently in July.

Ross also described several other ailments. She stated that she had her gallbladder removed and had undergone pineal surgery in 2007. That was her most recent surgery. She testified that she got monthly "migraine-type" headaches,

– 19 –

for which over-the-counter pain Tylenol was ineffective.  She also stated that she had asthma, for which she infrequently used an inhaler.

Finally, Ross testified that she had difficulty focusing, which she thought was either a side effect of her medications or related to her seizures.  She stated that she did not drive and that she believed she last smoked after her 2007 pineal surgery.  She testified that she was compliant with her medications and that her treating physician, Dr. Keith Morris, did occasional blood tests to see if there was a therapeutic dose of medication in her blood.

### *Testimony at the Hearing on February 2, 2011*

Ross appeared without a lawyer at a second hearing before the ALJ, and she stated she wished to proceed without counsel.  The ALJ inquired again about her duties at the nursing home where she worked from approximately 2000 to December 2006.  Ross testified that it was "a possibility" she would have had to lift up to 100 pounds there.  She also stated that she supervised up to 60 people and spent about 75 percent of her time supervising other people.

Before she worked at the nursing home, Ross had worked as a charge nurse at a dialysis clinic.  In that position, she helped patients from wheelchairs to dialysis chairs and lifted 20-pound boxes of fluid for the dialysis machines.  Ross took issue with the ALJ's prior finding that, as director of nursing, she would not have to lift much weight.  She stated that there was a state law that required a

nursing director to be able to lift at least 40 to 60 pounds.  The vocational expert

testified that she was unfamiliar with such a law or regulation but that "doesn't

mean it doesn't exist."

The ALJ also asked about Ross's seizures since the last hearing.  Ross

testified she had experienced two seizures during the previous month, and another

on December 28, 2010.  She described what happens when she has a seizure:

> Usually if I'm sitting down, I feel very lightheaded and get a severe
> headache and feel sick to my stomach, and I'll stay there.  But if I
> don't get that indication, I end up falling.

(Tr. p. 36.)  She got bumps and bruises but had sustained no serious injuries during

seizures.  She had lost control of her bladder once.  She stated that she took Keppra

and Klonopin for her seizures.

Ross testified that she had not seen a psychologist or psychiatrist since the

last hearing, and the only two doctors she had seen were Dr. Morris and Dr.

Gretchen Kluesner, who took over Dr. Morris' practice in 2010.  Before August

2010, Ross had seen Dr. Kluesner about every three months.  The ALJ asked Ross

if she was on any medication intended to treat depression or anxiety.  Ross

answered that she had not taken any medication for those purposes for well over a

year.  She had gradually gone off medications she used to take "because [she] was

on so much medication [she] couldn't afford to pay for medications."

Ross also provided testimony related to her other impairments.  She stated that she had just finished a course of antibiotics for bronchitis and she used her asthma inhaler once every three months.  The inhaler caused her to get oral yeast infections.  Her thyroid was within normal limits.  Ross informed the ALJ she had just been diagnosed with rheumatoid arthritis and Sjogren's syndrome.  Those conditions had been diagnosed based on two blood tests.  She had begun medication to treat the conditions a week prior to the hearing.  Ross also testified that she had constant chronic pain and inflammation in her back, for which she had received an injection.

The ALJ asked Ross why she had been "unable to go back to any form of work" since December 2006.  Ross answered:

> My condition would not allow me.  I was having frequent seizures.  I was having constant bronchitis.

(Tr. p. 41.)

### *Psychiatric Review Technique and Physical RFC Assessment*

On December 21, 2007, Stanley Hutson, PhD, completed a psychiatric review technique.  Hutson concluded from the records review that Ross had depressive disorder and an anxiety-related disorder, but that they were non-severe and resulted in no restriction of daily living activities, no difficulties in maintaining social function, and only mild difficulties in maintaining concentration,

persistence, or pace.  Hutson concluded that Ross's mental disorders did not severely affect her functioning or her ability to perform substantial gainful activity.

On December 28, 2007, Terri Helming completed a physical residual functional capacity assessment based on diagnoses of degenerative disc disease in the lumbar spine, seizures, and chronic bronchitis.  Helming concluded that Ross could occasionally lift 50 pounds; frequently lift 25 pounds; stand, sit, or walk for six hours of a normal eight-hour work day, and that she had no limitations related to pushing or pulling.  She found that Ross could frequently climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, but she could never climb ladders, ropes, or scaffolds because of the possibility she would have a seizure.  Finally, Helming found that Ross should avoid all exposure to hazards, because of possible seizure activity, as well as concentrated exposure to fumes, odors, dusts, and gases in order to prevent exacerbation of chronic bronchitis.

In support of those conclusions, Helming cited medical records showing mostly normal test results, including MRIs and chest x-rays.  Helming stated that Ross experienced only "occasional exacerbation of symptoms and pain resolved with rest, medications, and therapy."  Finally, Helming wrote that several of Ross's conditions had resolved completely and that she had "reported seizure activity without medical documentation of such."

### *Function Report*

Ross completed a function report on August 23, 2007.  In that report, she described what she did during the day, including starting a load of laundry, emptying the dishwasher, and fixing supper.  For supper, she prepared quick and easy complete meals and frozen dinners.  She wrote that she took care of her two stepchildren by cooking their meals, doing their laundry, helping them with homework and looking out for their general wellbeing.  She also stated that she took care of pets by providing them with food and water and took her father shopping and to doctor appointments.

She reported that before she became disabled, she had been able to lift, pull, clean, walk around the block, and drive long distances, none of which she could do now.  Ross also wrote that her back pain affected her sleep, and that it took her longer to dress and bathe.  She was unable to reach over her head to curl her hair.

Because of her impairments, Ross was no longer able to stand without pain in order to make large meals, and she needed help getting heavy things in and out of the oven.  She did light cleaning two to three hours per week, but had to rest frequently because of back pain and shortness of breath.  She was able to go grocery shopping, but did not drive because she would have to wait six months before driving again each time she had a seizure.

Ross wrote that her hobbies and interests included reading, watching TV, and swimming, which she did daily without problems.  However, she reported that it was more difficult to read for long periods because of headaches and back pain. She also visited her parents and talked on the phone.

Ross reported that her impairments affected many physical abilities, including lifting, squatting, kneeling, sitting, bending, standing, reaching, walking, and climbing stairs, as well as her abilities to concentrate and complete tasks.  She wrote that she was able to pay attention for one hour at a time and did not handle stress as well as she used to.  Finally, Ross wrote that her chronic bronchitis caused problems with her endurance and that she became easily fatigued.  She mentioned that her heart rate had been elevated since her pulmonary embolism, and that she had gained excess weight because of her medications, which led to a decreased ability to sustain activity.

### *Vocational Expert's Testimony*

At the second hearing, the ALJ posed a hypothetical to vocational expert Dolores Gonzalez.  The ALJ asked Gonzalez to consider a claimant of Ross's age, education, and past work experience who could lift and carry 20 pounds occasionally; 10 pounds frequently; sit, stand or walk for six hours out of eight; occasionally climb stairs and ramps, stoop, and crouch; never climb ropes, ladders, or scaffolds; avoid concentrated exposure to fumes, odors, dust, and gases; and

avoid all exposure to unprotected heights.  Given those restrictions alone, the ALJ asked Gonzalez if Ross could return to past relevant work.

In response, Gonzalez pointed out that, as Ross had described her work as nursing director, it would be classified as light to medium work.  However, as listed in the Dictionary of Titles and as customarily performed in the national economy, the position of nursing director is classified as sedentary, skilled work. The expert testified that Ross could perform her past work as nursing director as it is customarily performed.  She also stated that Ross's past relevant work would give her transferrable skills for other light or sedentary positions, including utilization review coordinator or case manager.

### III.   <u>Legal Standard</u>

This court's role on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole.  *Rucker v. Apfel*, 141 F.3d 1256, 1259 (8th Cir. 1998).  "Substantial evidence" is less than a preponderance but enough for a reasonable mind to find adequate support for the ALJ's conclusion.  *Id.*  When substantial evidence exists to support the Commissioner's decision, a court may not reverse simply because evidence also supports a contrary conclusion, *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005), or because the court would have weighed the evidence differently. *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).  This standard of review

requires consideration of evidence supporting the Commissioner's decision as well as evidence detracting from it.  *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir.2009). However, if the evidence allows for two inconsistent positions, and one of these positions represents the ALJ's findings, the court must affirm the ALJ's decision. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir.2011).

To determine whether substantial evidence supports the decision, the court must review the administrative record as a whole and consider:

(1) the credibility findings made by the ALJ;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and nonexertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

*Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585–86 (8th Cir. 1992).

Social security regulations define disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42

U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).

Determining whether a claimant is disabled requires the Commissioner to evaluate the claim based on a five-step procedure.

First, the Commissioner must decide whether the claimant is engaging in substantial gainful activity.  If so, she is not disabled.

Second, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities.  If the impairment is not severe, the claimant is not disabled.

Third, if the claimant has a severe impairment, the Commissioner evaluates whether it meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

Fourth, if the claimant has a severe impairment and the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, the Commissioner determines whether the claimant can perform past relevant work.  If the claimant can perform past relevant work, she is not disabled.

Fifth, if the claimant cannot perform past relevant work, the Commissioner must evaluate whether she can perform other work in the national economy.  If not, the claimant is declared disabled.  20 C.F.R. § 404.1520; § 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is uncorroborated by objective medical evidence.  *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). However, the ALJ may disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  *See, e.g., Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990).  When considering subjective complaints, the ALJ must consider the factors set out in *Polaski v. Heckler*, 739 F.2d 1320, 1321–22 (8th Cir. 1984), which include:

> the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions.

*Id.*; *see also Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011).

### ***ALJ Decision on April 5, 2011***

After remand by the Appeals Council, the ALJ held that Ross's impairments of degenerative disc disease of the lumbar spine, seizures, and chronic bronchitis were severe; that her impairments of anxiety and depression were non-severe; and that her pulmonary embolism and possible Sjogren's syndrome had failed to meet

the 12-month duration requirement.  The ALJ found that Ross did not have an

impairment or combination of impairments that met or medically equaled one of

those listed in 20 C.F.R. Part 404, Subpart P, App. 1.

   With respect to Ross's anxiety and depression, the ALJ noted that Ross's

treating doctor classified both illnesses as "stable," had not noted any worsening,

and had not referred her to a psychologist or psychiatrist.  He relied upon Ross's

testimony that she had not taken any medication intended to treat anxiety or

depression for more than a year, as well as a psychiatric review technique form

from December 21, 2007, which found no severe mental impairment.  The ALJ

found that the PRT was consistent with Ross's medical treatment records.  "At

most," the ALJ wrote, "it appears that the claimant has a history of short-term

depression or anxiety without evidence of ongoing symptoms or supportive

objective medical findings."

   The ALJ noted that Ross's pulmonary embolism had resolved.  Although

she had required treatment for right lower extremity edema and pain in June and

July 2008, an MRI showed only "minimal" edema and it had not worsened since

then. The ALJ also found that Ross's history of hypothyroidism, left shoulder pain,

cholelithiasis, headaches, respiratory impairments including asthma, and chest pain

and other heart-related complaints were non-severe and did not meet the 12-month

duration requirement.

The ALJ held that Ross's degenerative disc disease, chronic bronchitis, and seizures were severe but did not limit her function more than he had already accounted for when assessing her RFC.  In particular, he noted that Ross's treatment records did not corroborate her allegations of function significantly impaired by pain and other symptoms.

When analyzing the medical records related to Ross's degenerative disc disease, the ALJ noted that MRIs of Ross's lumbar spine revealed only "mild" degenerative changes and "minimal" disc bulge; that there were no objective medical findings of significant deficits in Ross's strength, neurological function, ranges of motion, posture, sensation, reflexes, pulses or gait related to the back; there were no medical observations of significant deficits in the ability to squat, stand, walk, sit, lift, carry, bend or stoop; and her back impairment had not worsened after May 2010.

When evaluating the impact of Ross's chronic bronchitis, the ALJ pointed out that Ross did not often use her inhaler; that she testified she had stopped smoking in 2007 but treatment records indicated that she smoked at least through January 2008; that she had not frequently visited an emergency room for breathing complaints; and that her condition had not worsened since July 2008.

In addition, the ALJ considered Ross's seizures.  He relied upon treatment notes describing the seizure activity as "stable" and "under control," which did not

– 31 –

document recurrent complaints related to seizures in most of 2007 and 2008;
Ross's reports that her seizure medication was working; her description of her
seizures as "mild" and not requiring emergency room treatment or hospitalization;
and treatment records which did not document "actual seizure activity by medical
treating staff" or significant motor, emotional, or mental deficits from seizures.

The ALJ also considered Ross's new diagnoses of rheumatoid arthritis and
possible Sjogren's syndrome.  He noted that there was no evidence of symptoms
related to these impairments prior to 2009.  He pointed out that connective tissue
test revealed only "borderline" results for Sjogren's and no results for rheumatoid
arthritis.  He ultimately found that Ross's rheumatoid arthritis was neither severe
nor medically determinable and that her Sjogren's syndrome was only possible and
had not met the 12-month duration requirement.

The ALJ assessed Ross's credibility unfavorably as to her allegations of
disability and limitations of daily activities.  He noted that there was no medical
evidence of decreased memory and concentration as Ross alleged, prolonged
hospitalization, or significant mental or physical limitations imposed by a doctor.
She was not frequently reported to be in acute distress or to exhibit significant pain
behaviors like abnormal breathing, elevated blood pressure, or uncomfortable
movement.  There was no evidence Ross had sought use of an assistive device, a

work hardening program,[2] or a pain clinic.  Though Ross had a "fairly steady work history," neither the medical nor non-medical evidence bolstered her credibility.

Ultimately, the ALJ found that Ross had the residual functional capacity necessary to perform light work, except that her impairments precluded her from lifting more than 10 pounds frequently and 20 pounds occasionally.  Relying on the DOT description of director of nursing as "sedentary," the ALJ held that Ross could perform her past relevant work as it was generally performed.  Therefore, he concluded she was not disabled.

## IV.   <u>Discussion</u>

Ross makes three principal arguments.  First, she argues that the ALJ made an improper RFC determination by failing to include additional limitations caused by Ross's seizures, mental conditions, and back pain.  As a corollary to that argument, Ross contends that the ALJ improperly analyzed the treatment records related to those conditions.  Second, Ross argues that the ALJ failed his duty to develop a full and fair record by not ordering a consultative examination.  Third, Ross argues that the ALJ improperly failed to consider the *Polaski* factors when assessing her credibility.

---

[2]  A work hardening program "is an interdisciplinary, individualized, job specific program of activity with the goal of return to work."  Such programs "use real or simulated work tasks and progressively graded conditioning exercises that are based on the individual's measured tolerances."  *Work Hardening Program Standards*, Dep't of Labor & Indus., p. 1, http://www.lni.wa.gov/ClaimsIns/Files/ReturnToWork/WhStds.pdf.

### A.   *RFC Determination*

Residual functional capacity is what a claimant can still do despite his or her physical or mental limitations.  20 C.F.R. pt. 404.1545(a); *Lauer v. Apfel*, 245 F.3d 700, 703 (8th Cir. 2001).  A disability claimant has the burden of establishing her RFC.  *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).

The ALJ assesses a claimant's RFC at step four of the sequential evaluation.  An ALJ must make specific findings as to the claimant's limitations and how those limitations affect the claimant's RFC.  *Pfitzner v. Apfel*, 169 F.3d 566, 568–69 (8th Cir. 1999).  The ALJ must base these findings on "all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations."  *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007).  Determination of a claimant's RFC is a medical question.  *Lauer*, 245 F.3d at 704.

In this case, the ALJ determined that Ross had the residual functional capacity to perform light work, except that her impairments precluded her from lifting and carrying more than ten pounds frequently and twenty pounds occasionally.  The ALJ found that Ross could sit for six hours of an eight-hour work day; stand or walk for six hours of an eight-hour work day; occasionally climb stairs and ramps; and occasionally stoop or crouch.  He found that Ross should avoid concentrated exposure to fumes, odors, dust and gases; and all exposure to hazards of unprotected heights.  After reviewing all the relevant

evidence, I conclude that the RFC determination was supported by sufficient evidence.  *See Lauer*, 245 F.3d at 706.

### *Seizure Disorder*

Although the ALJ found that Ross's history of seizures was severe, he ultimately concluded that it did not prevent her from engaging in her past relevant work as nursing director.  Ross contends that this conclusion failed to account for additional limitations caused by her seizures and improperly minimized treatment records related to her seizures.  For instance, the ALJ stated that "seizures are not reported after June 16, 2008."  This is not true.  Records from Dr. Morris include references to two self-reported seizures in November 2008, and one each in in February, March, and May 2009.  Ross also reported three seizures during the past "3-4 months" at an office visit with Dr. Morris on December 7, 2009.  At an office visit with Dr. Kluesner on August 30, 2010, Ross reported she was having seizures approximately once per month.

However, the ALJ's misstatement regarding Ross's seizures was harmless because there is "no indication that the ALJ would have decided differently" had the error not occurred.  *Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012).  The ALJ considered Ross's testimony about seizures occurring after June 16, 2008 and he properly discounted her testimony in part because there was a lack of medical evidence supporting her claims.  Although an ALJ may not discount testimony

solely due to a lack of medical evidence, it is one factor that may properly be considered. *Halpin v. Shalala*, 999 F.2d 342, 346 (8th Cir. 1993).

In addition, there was no evidence whatsoever of seizures occurring between August 2007 and April 2008. Though Ross went to office visits with Dr. Morris during that period, treatment records do not indicate any seizures. Ross herself stated she did not need to seek emergency treatment for her seizures, which she described as "mild" and lasting only two to three minutes. Dr. Morris repeatedly indicated in his treatment notes that Ross's seizures were "stable," "under control," and had responded to medication. Finally, the ALJ did account for one limitation related to Ross's seizure – the need to avoid all exposure to unprotected heights – when determining her RFC. As a whole, there is substantial evidence to support the ALJ's conclusion that this was the only work limitation the seizure disorder imposed on Ross. *See, e.g., Samons v. Astrue*, 497 F.3d 813, 818–20 (8th Cir. 2007) (where treatment records showed claimant with epilepsy had gone long periods with few or no seizures, even according to claimant's own reports, the ALJ's determination that claimant could perform past relevant work as a cook, among other jobs, was supported by substantial evidence); *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) (the fact that claimant's seizures were controlled with medication supported ALJ's determination that claimant could perform light work).

### *Depression and Anxiety*

The ALJ concluded Ross's impairments of depression and anxiety were not severe.  In making this determination, the ALJ relied upon a psychiatric review technique form dated December 21, 2007, in which a state agency psychologist concluded that Ross's depression and anxiety did not interfere with her social functioning or activities of daily living and did not result in repeated episodes of decompensation.  *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).  In addition, the ALJ considered the fact that Ross did not ever seek treatment from a psychologist, psychiatrist, or counselor (or receive a referral thereto); that her mental impairments were found to be "stable" at the overwhelming majority of office visits; that treatment records showed no significant, ongoing abnormalities with persistent sadness, feelings of hopelessness, excessive crying, or problems with concentration, memory, or comprehension; and that Ross had not taken medication to alleviate symptoms of depression or anxiety for more than a year before the second hearing.[9]  Altogether, this constitutes substantial evidence in the record to support the ALJ's conclusion that Ross's mental impairments were non-severe.  *See, e.g., Buckner*, 646 F.3d at 556–57 (psychiatric review technique

---

[9]  Ross argues that she did not take medications for depression or anxiety because she could not afford them.  "Although lack of financial resources may in some cases justify the failure to seek medical attention," this is not the case here, where there is no evidence Ross sought financial assistance or told her physician she could not afford treatment.  *Johnson v. Bowen*, 866 F.2d 274, 275 (8th Cir. 1989).  *See also Benskin v. Bowen*, 830 F.2d 878, 884 n.1 (8th Cir. 1987); *Craig v. Chater*, 943 F.Supp. 1184, 1190 (W.D. Mo. 1996).

showing minimal interference with daily living activities, plus health care provider's note that claimant could manager his depression and anxiety without medication, supported ALJ's conclusion that claimant's mental impairments were not severe); *see also* 20 C.F.R. § 404.1529(c)(4).

Even though he properly determined Ross's impairments of depression and anxiety were not severe, the ALJ was required to consider their impact on Ross's maximum RFC.  *See* 20 C.F.R. § 404.1545.  Though he did not explicitly "list and reject" the possibility that Ross's non-severe mental impairments affected her RFC, such a task is not required.  *See McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011).  By virtue of his thorough discussion of Ross's depression and anxiety when he evaluated their severity, the ALJ implicitly found that they imposed no limitations on her RFC.  *See, e.g., id.*;  *Hilkemeyer v. Barnhart*, 380 F.3d 441, 447 (8th Cir. 2004) ("The ALJ's decision not to incorporate [claimant's mild impairment] in the RFC, as well as in the hypothetical posed to the VE, was not error because the record does not suggest there were any limitations caused by this nonsevere impairment."); *Jackson v. Apfel*, 162 F.3d 533, 538 (8th Cir. 1998) (hypothetical question may omit non-severe impairments).

## *Back Pain*

Though the ALJ found that Ross's degenerative disc disease was a severe impairment, Ross argues that the ALJ erred in analyzing the effect of the pain and

other limitations caused by the disease.  She contends that the ALJ's determination

of her RFC is not supported by substantial evidence.  After examining the record as

a whole, I disagree.  The ALJ limited Ross to light work, lifting 20 pounds

occasionally and 10 pounds frequently, and only occasionally stooping, crouching,

and climbing stairs and ramps.  In rejecting Ross's contention that she has greater

limitations, the ALJ relied upon the fact that MRIs of Ross's lumbar spine

repeatedly showed only "mild" degenerative fact changes and a "minimal" disc

bulge.  He also considered the fact that treatment records showed Ross had normal

strength, motion, gait, sensation, and bulk; generally reported that she had a full

range of motion and a normal gait; and that Ross denied complications from her

pain medication.  Her doctors did not prescribe an assistive device for walking,

such as a cane; did not impose any physical limitations upon Ross's ability to

function; did not generally note that Ross was in acute distress; and did not

document pain behaviors such as abnormal breathing, uncomfortable movement, or

elevated blood pressure.  Further, Ross wrote in a function report that she cared for

her stepchildren and pets, prepared uncomplicated dinners, took her father grocery

shopping and to the doctor, and swam on a daily basis without problems.  In all,

this constitutes substantial evidence that supports the ALJ's determination of

Ross's RFC.  *See Melton v. Apfel*, 181 F.3d 939, 941 (8th Cir. 1999) ("The mere

fact that working may cause pain or discomfort does not mandate a finding of

disability."); *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996) (where claimant

testified that he was able to care for a child on a daily basis, drive a car when

unable to find a ride, and sometimes go to the grocery store, the decision to deny

benefits was supported by substantial evidence).

**B.**     ***Failure to Fully Develop Record***

Ross argues that the ALJ failed to fully and fairly develop the medical

evidence regarding her back condition, seizure disorder, and mental impairments.

Specifically, Ross contends that the ALJ should have ordered a consultative

examination of Ross's limitations related to these conditions.

Because Social Security disability proceedings are not adversarial, "the

ALJ's duty to develop the record exists independent of the claimant's burden in the

case." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).  This duty includes

the ordering of a consultative examination when such an evaluation is necessary

for an informed decision.  *Haley v. Massanari*, 258 F.3d 742, 749 (8th Cir.2001).

But the ALJ need not order a consultative examination if the record contains

substantial evidence to support the ALJ's decision.  *Id.*

Here, as I stated above, there was already substantial evidence in the record

to support the ALJ's determinations that Ross's mental impairments were not

severe and that she could perform her past relevant work, as well as to support his

overall decision to deny benefits.  There were ample treatment records from

multiple treating doctors in the record, as well as consultative reports, that

permitted the ALJ to make an informed decision.  Therefore, the ALJ did not

commit reversible error by not ordering a consultative examination.  *Johnson v.*

*Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) ("[t]he ALJ is required to order medical

examinations and tests only if the medical records presented to him do not give

sufficient medical evidence to determine whether the claimant is disabled.").

## C.     *Credibility Assessment*

Under the framework set forth in *Polaski*, an ALJ must consider the

following factors when evaluating a claimant's credibility:

> (1) the claimant's daily activities; (2) the duration, intensity, and frequency
> of pain; (3) the precipitating and aggravating factors; (4) the dosage,
> effectiveness, and side effects of medication; (5) any functional restrictions;
> (6) the claimant's work history; and (7) the absence of objective medical
> evidence to support the claimant's complaints.

*Buckner*, 646 F.3d at 558.  The ALJ is not required to explicitly discuss each

*Polaski* factor.  *Id*.  "It is sufficient if he acknowledges and considers those factors

before discounting a claimant's subjective complaints."  *Strongson v. Barnhart*,

361 F.3d 1066, 1072 (8th Cir. 2004).  Although an ALJ cannot discount a

claimant's subjective allegations of pain based solely on a lack of objective medical

evidence to support them, he may find a lack of credibility based on

inconsistencies in the evidence as a whole.  *See Ford v. Astrue*, 518 F.3d 979, 982

(8th Cir. 2008).

The "credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009). Consequently, courts should defer to the ALJ's credibility finding when the ALJ explicitly discredits a claimant's testimony and gives good reason to do so. *Buckner*, 646 F.3d at 558.

In this case, it is true that the ALJ did not discuss every one of the *Polaski* factors, and he did not cite *Polaski* in the second decision.  Contrary to Ross's argument, however, a failure to explicitly cite *Polaski* is not alone grounds for remand if the ALJ adequately considers some of the required factors.  *See Buckner*, 646 F.3d at 558 (where an ALJ discussed four *Polaski* factors in depth, his credibility determination was affirmed).

In fact, the ALJ in this case did discuss the following five *Polaski* factors: Ross's daily activities; the dosage, effectiveness, and side effects of her medication; her lack of functional restrictions; her work history; and the absence of objective medical evidence to support her complaints.  Ultimately, the ALJ found that Ross's steady work history did not assuage the credibility problems caused by the rest of the factors.

The ALJ wrote that:

[I]n light of all of the above, the medical treatment records do not support allegations of disabling limitations of function.  The claimant's allegations fare little better when considered in light of the remainder of the record.

– 42 –

(Tr., p. 24.)  He went on to state that the following factors supported his assessment that Ross's "allegations of disability are found not credible":  (1) a lack of "any physician's findings" supporting her allegations of decreased memory and concentration due to the side effects of her medications; (2) the fact that Ross "declined medications that might have helped her out of concern that a member of her household might take them"; (3) no significant limitations imposed by any treating physician; (4) no prolonged hospitalizations; (5) no prescription of an assistive device for walking or movement; (5) Ross's failure to seek treatment through a work hardening program or pain clinic; and (6) a lack of evidence in the treatment records of external signs of pain, such as abnormal breathing or reports of "acute distress."  He also concluded that Ross's "allegations of severely limited daily activities" were not credible.  Altogether, this constitutes substantial evidence to support the ALJ's credibility determination.  *See Strongson*, 361 F.3d at 1072.

Further review of the entire administrative record lends additional support the ALJ's findings.  In a function report, Ross wrote that she did laundry, cooked quick meals, helped her stepchildren with their homework, provided food and water to pets, occasionally drove her father to the grocery store and the doctor's office, and read, watched television, and swam daily without problems.  The inconsistencies between her subjective complaints and her daily living patterns diminish her credibility.  *See Shannon v. Chater*, 54 F.3d 484 (8th Cir. 1995)

(where claimant sometimes needed help with household cleaning, but cooked breakfast, visited friends and relatives, and attended church twice a month, his activities were inconsistent with his complaints of nearly unbearable pain in both of his knees "mostly all the time").

In addition, Dr. Morris and Dr. Haas provided some notes releasing Ross from work during the alleged disability period, particularly in early 2007.  But although Dr. Morris advised on November 15, 2006, that Ross should not lift more than ten pounds, he also wrote that she could "work as tolerated per further notice."  Similarly, after Ross was released from her hospitalization in March 2007, she was permitted to engage in any activity "as tolerated."  The fact that no physician imposed any physical limitations of any kind on Ross supports the ALJ's credibility finding.  *See Melton*, 181 F.3d at 941.

Finally, the treatment records indicate clearly that at least some of Ross's impairments are treated effectively with medication.  For example, Dr. Morris noted at an office visit August 21, 2007, that Ross was experiencing no side effects from her anxiety and back pain medications.  On April 6, 2009, Dr. Morris reported that Ross's "seizure medication is working" and her seizures "have been fairly well controlled."  Dr. Morris frequently indicated that Ross's conditions were all "stable."  Whether impairments respond to medication is a proper consideration under *Polaski*.  *Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir.

– 44 –

2009).  If an impairment can be controlled by treatment or medication, it cannot be considered disabling.  *Brown v. Astrue*, 611 F.3d 941, 955 (8th Cir. 2010).

Based on the foregoing, I conclude that the ALJ properly discredited Ross's allegations of disabling pain and limitations, and there are good reasons for doing so.  Therefore, I defer to his finding of non-credibility.  *See Perkins*, 648 F.3d at 900 ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth.").

## V.   **Conclusion**

I conclude that there is substantial evidence on the record to support the Commissioner's decision to deny benefits.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed.

A separate judgment in accord with this Memorandum and Order is entered this date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 25th day of March, 2013.